In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 15-3175

WILLIAM D. AVERY,

*Plaintiff-Appellant*,

*v.*

CITY OF MILWAUKEE, *et al.*,

*Defendants-Appellees*.

_____

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 11-C-408 — **Rudolph T. Randa**, *Judge*.

_____

ARGUED FEBRUARY 23, 2016 — DECIDED JANUARY 30, 2017

_____

Before WOOD, *Chief Judge*, SYKES and HAMILTON, *Circuit Judges*.

SYKES, *Circuit Judge*. In February 1998 Maryetta Griffin was raped and strangled to death and left in an abandoned garage on Milwaukee's north side. In 2004 Milwaukee police arrested William Avery for the crime. He was convicted of first-degree homicide and spent six years in prison before DNA evidence proved that Walter Ellis, a serial killer linked

to nine similar homicides, was responsible for the murder. In 2010 Avery was released from prison; this wrongful-conviction suit followed. Avery alleged that Milwaukee detectives concocted a fake confession and induced three jailhouse informants to falsely incriminate him—evidence that was ultimately used to convict him. He also claimed that the detectives failed to disclose, as required by *Brady v. Maryland*, 373 U.S. 83 (1963), impeachment evidence about how they obtained the false statements from the informants. Finally, Avery added a claim against the City of Milwaukee under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

The district judge rejected the *Brady* claims on summary judgment, reasoning that the detectives had no duty to disclose the impeachment evidence because Avery already knew the informants' statements were false. The remaining claims were tried to a jury, which found two of the detectives liable for violating Avery's due-process rights. The jury also found the City liable and awarded $1 million in damages.

Avery's victory was short-lived. The judge invalidated the verdict against the detectives based on what he said were "mixed signals" coming from this court on whether an officer's fabrication of evidence is actionable as a due-process violation. The judge also set aside the verdict against the City, holding that without a constitutional violation by the detectives, *Monell* liability was not possible.

We reverse. Avery's due-process claims fall comfortably within our decision in *Whitlock v. Brueggemann*, 682 F.3d 567 (7th Cir. 2012), so the jury's verdict was legally sound and must be reinstated in its entirety. The *Brady* claims, too, must

be revived. That Avery knew the informants' statements were false did not relieve the detectives of their duty to disclose impeachment evidence. Avery is entitled to resume litigation of these claims.

## I. Background

Maryetta Griffin, known as "Mercedes," was sexually assaulted and strangled to death in the early morning hours of February 17, 1998. Her body was found in an abandoned garage in a decrepit and crime-ridden neighborhood on Milwaukee's north side. Griffin's death was tragic; so was her life. She made her living as a prostitute and was addicted to crack cocaine.

William Avery knew Griffin. He ran a drug house in the neighborhood and occasionally exchanged drugs for sex with prostitutes in the area. Griffin, along with several other prostitutes, had been at Avery's drug house the day before her death.

About a month after Griffin was killed, detectives from the Milwaukee Police Department asked Avery to come to the station to speak with them about the murder. Avery complied; he denied any involvement in her death. After two prolonged rounds of interrogation by four different detectives, he was sent to a holding cell for the night. The next day two detectives from the day before—Daniel Phillips and Gilbert Hernandez—resumed the interrogation. Avery again denied involvement in the crime. The detectives continued to badger him, accusing him of killing Griffin. They reminded him that Mercedes was last seen alive at his drug house and suggested that perhaps she had tried to steal from him and a struggle or chase ensued. Maybe she fell

down the stairs and broke her neck during the struggle? Avery denied that this happened.

Ignoring his persistent denials, Detectives Phillips and Hernandez prepared reports falsely stating that Avery confessed to the murder and gave the following account of events: Mercedes was at his drug house on the night in question; he fell asleep and woke up to find her stealing cash from his pockets; he remembered fighting with her but couldn't recall what happened next, though he did remember telling a third person that he "killed this bitch"; and finally, he admitted that he killed Mercedes but couldn't remember how he did it.

Detectives Phillips and Hernandez gave their reports to Assistant District Attorney Mark Williams, Milwaukee's chief homicide prosecutor. Williams concluded that the evidence was insufficient to support a homicide charge. Avery was instead charged with state narcotics offenses arising from his drug-house operation. He was convicted and began serving a short prison term.

While in prison Avery met fellow inmates Keith Randolph, Antron Kent, and Jeffrey Kimbrough. All three men eventually became prosecution witnesses at his trial for Griffin's murder. Avery's *Brady* claims are premised on the failure by Milwaukee detectives to disclose details about their interrogations of these jailhouse informants—evidence that could have been used to impeach the informants when they testified at trial. For present purposes, the defendants do not contest the factual basis for Avery's *Brady* claims, so the following account is his version of events.

Detectives Hernandez and Katherine Hein interviewed Randolph in prison in October 2003.[1] The two detectives supplied him with details about the Griffin homicide, told him to point the finger at Avery, and promised in return to help him win a reduced sentence. Randolph eventually succumbed to the pressure; he told them that Avery had admitted that he killed Griffin. The detectives prepared reports to that effect but omitted facts about the interrogation that could have been used for impeachment purposes. Randolph was called as a prosecution witness at Avery's murder trial but refused to perjure himself by repeating the statement he gave to the detectives. The prosecution was permitted to introduce the detectives' reports into evidence, so the jury heard Randolph's incriminating statement anyway—without the details about the interrogation that might have caused the jurors to doubt its reliability.

The story line on Kent is similar. Detectives coached and pressured him on multiple occasions over several years: in phone calls from Detective Kevin Armbruster; in an interview with Detectives Armbruster and Timothy Heier; in an interview with Detectives Hernandez and Hein; in another meeting with Detective Heier. The upshot is that like Randolph, Kent eventually gave in and said that Avery told him he strangled Griffin to death. Kent testified to that effect at Avery's trial. Again, the circumstances of the interrogation— that the detectives coached and pressured Kent to implicate Avery—were not disclosed to the defense.

---

[1] Katherine Hein is now Katherine Spano, her married name.

Detectives Armbruster and Heier were the first to question Kimbrough, and Detectives Hein and Hernandez conducted a follow-up interview. As with Randolph and Kent, the detectives fed Kimbrough details about the Griffin murder and pressured him to implicate Avery. They eventually got what they were looking for: Kimbrough told them that Avery admitted that he killed Griffin. Kimbrough later recanted this statement and tried to back out of testifying at Avery's trial, but Detective Heier told him that he "had to" testify. Kimbrough did as he was told; he took the stand and testified that Avery told him he killed Griffin. Neither the recantation nor the facts about Kimbrough's interrogation were disclosed to the defense.

Avery completed his narcotics sentence in June 2004 and was released from prison. Three months later he was arrested and charged with Griffin's murder. Trial was held in March 2005. Detectives Phillips and Hernandez testified about Avery's confession; their reports were also admitted. As we've noted, Kent and Kimbrough testified that Avery told them he strangled Griffin. And the prosecution introduced the police reports documenting the statements of all three jailhouse informants. The jury found Avery guilty. He was sentenced to 40 years in prison.

In 2009 the Wisconsin State Crime Laboratory informed the Milwaukee Police Department that evidence from the scenes of nine unrelated homicides contained DNA from the same person—suggesting, of course, that all nine murders were committed by a single person. The victims shared remarkable similarities: All were drug-addicted prostitutes, and many were strangled to death and later found in dilapidated areas on the north side of Milwaukee. Walter Ellis was

identified as the likely perpetrator; his DNA was found on evidence recovered from all nine homicide scenes. Ellis was eventually convicted of seven of these murders; he died in prison of natural causes.

When news of the Ellis DNA match broke, Avery wrote to the Milwaukee District Attorney asking him to test DNA evidence found on Griffin's body to see if it matched Ellis's. It did. Avery's conviction was vacated, and he was released from prison in May 2010.

He then filed this wrongful-conviction suit raising claims under 42 U.S.C. § 1983 for violation of his due-process rights. The first set of claims alleged *Brady* violations arising from the suppression of the impeachment evidence about the interrogations of the jailhouse informants Randolph, Kent, and Kimbrough. The second set alleged that Detectives Phillips and Hernandez violated his due-process rights by falsifying his confession, and that Detectives Hernandez, Heier, Hein, and Armbruster violated his due-process rights by fabricating the informants' false statements. Finally, Avery included a *Monell* policy-or-practice claim against the City of Milwaukee.

The judge rejected the *Brady* claims on summary judgment, reasoning that because Avery "knew what he said (or didn't say) to the jailhouse informants," the *Brady* disclosure duty "drops out." The other claims were tried to a jury, which found Detectives Phillips and Hernandez liable for fabricating Avery's confession, found the City liable on the *Monell* claim, and awarded $1 million in damages.

The defendants filed a Rule 59(e) motion to set aside the verdict, arguing that the evidence-fabrication claims against

the detectives were really coerced-confession claims and that coercing a confession doesn't violate due process. The judge didn't buy it; instead, he granted the motion on two alternative grounds, neither of which was raised in the motion.

First, the judge said he detected "mixed signals" coming from this court on the subject of due-process claims based on evidence fabrication. He concluded that because an evidence-fabrication claim "sounds" in malicious prosecution and Wisconsin provides a remedy for this tort, Avery's due-process claims were not viable. In the alternative, the judge held that Avery wasn't really injured by the detectives' fabrication of evidence at all; rather, it was their false testimony at trial that caused his injury, and giving testimony is protected by absolute immunity. Either way, the judge held, the verdict against the detectives could not stand. He also held that without an underlying constitutional violation by an individual defendant, the City couldn't be liable under *Monell*. Final judgment for all defendants followed.

Avery appealed, challenging the judge's decision on the Rule 59(e) motion and his refusal to allow the *Brady* claims to proceed to trial.

## II. Analysis

### A. Due-Process Claims for Evidence Fabrication

We begin with Avery's challenge to the Rule 59(e) ruling. In their motion the detectives argued that the claims on which the jury found them liable were actually impermissible coerced-confession claims, not genuine evidence-fabrication claims. The judge rejected this argument, concluding instead that a due-process claim "sounds" in malicious prosecution and therefore Avery's claims were

"knocked out" as a matter of law because Wisconsin law provides a remedy for that tort. He also held that the detectives' testimony at trial—and *not* their act of fabricating evidence—caused Avery's injury and that witnesses at a criminal trial are absolutely immune from suit for damages flowing from their testimony.

Rule 59(e) rulings are reviewed for abuse of discretion, but embedded legal questions are reviewed de novo. *ACLU v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012). This appeal raises purely legal questions. Before we turn to them, however, we have a threshold question about which (if any) of the arguments in support of the judge's ruling are properly before us.

Avery urges us to ignore all three arguments because the defendants did not properly preserve them. As he sees it, the Rule 59(e) motion was really a misnamed Rule 50(b) motion for judgment as a matter of law; he asks us to treat it as such. He then points to the familiar rule that a Rule 50(b) motion may only seek relief on grounds preserved in a Rule 50(a) motion at the close of the evidence. *See Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008). The defendants didn't follow this procedure.

Avery is right that the caption on a motion "is not essential," but he overlooks the fact that a Rule 59(e) motion can be used "to ask that a judgment be set aside in its entirety." *A.D. Weiss Lithograph Co. v. Ill. Adhesive Prods. Co.*, 705 F.2d 249, 250 (7th Cir. 1983). That was the relief sought here, and Rule 59(e) was not an improper vehicle. Avery counters that if the Rule 59(e) motion was indeed proper, the defendants are limited to the single argument raised in their moving

papers and cannot now defend the judge's actual reasons for setting aside the verdict.

It's true that the judge reached beyond the sole argument raised in the Rule 59(e) motion, resting his decision on his own analysis of the legal viability of Avery's due-process and *Monell* claims. But a district judge is permitted to "enlarge the issues to be considered in acting on a timely motion under Rule 59." *Charles v. Daley*, 799 F.2d 343, 347 (7th Cir. 1986). The question for us is whether the judge's Rule 59(e) decision was legally sound. We conclude that it was not.

To defend their posttrial victory, the defendants begin by reprising their failed argument that Avery never asserted genuine evidence-fabrication claims in the first place. They insist that this case boils down to a claim about the use of coercion. We have indeed drawn a distinction between a "'coercion' case for which there is no cognizable due process claim … [and] an 'evidence fabrication' case where there is a cognizable claim." *Petty v. Chicago*, 754 F.3d 416, 422–23 (7th Cir. 2014). But the defendants' argument is an exercise in misdirection: It's clear that Avery's due-process claims are factually grounded in acts of evidence fabrication by the detectives—evidence that was later used to convict and imprison him.

"We have consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of [his] liberty in some way." *Whitlock*, 682 F.3d at 580; *see also Mooney v. Holohan*, 294 U.S. 103, 112 (1935) (explaining that the use of perjured testimony "to procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is

the obtaining of a like result by intimidation"). On the other hand, a claim that an officer coerced a witness to give incriminating evidence does not, at least standing alone, violate the wrongly convicted person's due-process rights.[2]

As we explained in *Petty*, "coercively interrogating witnesses, paying witnesses for testimony, and witness-shopping may be deplorable, and these tactics may contribute to wrongful convictions, but … unlike falsified evidence and perjured testimony, [coerced testimony] may turn out to be true." 754 F.3d at 422 (internal brackets and quotation marks omitted). Because coerced testimony may in fact be true, the due-process right to a fair trial isn't implicated absent a violation of the *Brady* duty to disclose facts about the coercive tactics used to obtain it. *See Fields v. Wharrie* (*Fields II*), 740 F.3d 1107, 1123 (7th Cir. 2014) (Sykes, J., concurring in part and dissenting in part) ("[I]f the police officers … withhold exculpatory information about coerced or fabricated evidence, the aggrieved defendant will have a good § 1983 claim against the officers for violation of *Brady*."). Armed with the *Brady* disclosure, the accused can impeach the coerced testimony by pointing to the tactics the officers used to extract it, and the jury has a fair opportunity to find the truth.

The same cannot be said for fabricated evidence. Falsified evidence will *never* help a jury perform its essential truth-

---

[2] Using a coerced confession against the accused at trial may give rise to a claim for violation of the accused's Fifth Amendment right not to be a witness against himself. *See Chavez v. Martinez*, 538 U.S. 760, 767 (2003). Avery raised only due-process claims.

seeking function. That is why convictions premised on deliberately falsified evidence will always violate the defendant's right to due process. What's relevant is not the label on the claim, but whether the officers "created evidence that *they knew to be false*." *Petty*, 754 F.3d at 423 (emphasis added). The jury found that Detectives Phillips and Hernandez knew their reports of Avery's confession were false when they wrote them; those reports—and the fake confession—were used at trial to convict him. The detectives can't escape liability for this due-process violation by shifting the focus to the background facts about the tactics they used to interrogate him.

This brings us to the two grounds on which the judge actually rested his Rule 59(e) decision. First, and primarily, the judge held that an evidence-fabrication claim "sounds" in malicious prosecution and therefore Avery's due-process claims were "knocked out" by Wisconsin's common-law remedy for that tort. This reasoning traces to *Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001), which in turn relied on Justice Kennedy's concurring opinion in *Albright v. Oliver*, 510 U.S. 266 (1994).

To properly understand *Newsome*, it's important to recall the nature of the claim asserted in *Albright*. As we recently explained in *Armstrong v. Daily*,

> [t]he claim in *Albright* was only that the plaintiff had been prosecuted without probable cause. … [T]here was no claim that a law enforcement official had acted in bad faith to undermine the reliability of a trial, such as by manufacturing false evidence, arranging for

> perjured testimony, or destroying exculpatory evidence.

786 F.3d 529, 540 (7th Cir. 2015).

To be more specific, the plaintiff in *Albright* had been arrested and released on bail, but the charges against him were later dropped. He asked the Supreme Court to recognize a due-process right to be free from criminal prosecution except on probable cause. 510 U.S. at 271. A four-justice plurality held that there is no such right, at least not under the Fourteenth Amendment's Due Process Clause.[3] *Id.* at 274. Justice Kennedy, joined by Justice Thomas, concurred in the judgment, agreeing that there is no freestanding due-process right not to be prosecuted except on probable cause; the concurrence invoked the doctrine announced in *Parratt v. Taylor* that "[i]n the ordinary case where an injury has been caused … by a random and unauthorized act that can be remedied by state law, there is no basis for intervention under § 1983, at least in a suit based on 'the Due Process Clause of the Fourteenth Amendment *simpliciter*.'" *Id.* at 285 (Kennedy, J., concurring in the judgment) (quoting *Parratt v. Taylor*, 451 U.S. 527, 536 (1981)).

---

[3] The plurality suggested that if the plaintiff had a claim at all, it would be for an unreasonable seizure in violation of the Fourth Amendment. *Albright v. Oliver*, 510 U.S. 266, 274 (1994). But three justices in the plurality "express[ed] no view as to whether [the plaintiff's] claim would succeed under the Fourth Amendment," *id.* at 275; Justice Ginsburg concluded that the plaintiff had an actionable Fourth Amendment claim, *id.* at 276–81 (Ginsburg, J., concurring). The Fourth Amendment issue has returned to the Supreme Court in a case argued earlier this term. *Manuel v. City of Joliet*, No. 14-9496 (oral argument held Oct. 5, 2016).

*Newsome* read Justice Kennedy's opinion as the narrowest ground of decision in *Albright*. *Newsome*, 256 F.3d at 751 (citing *Marks v. United States*, 430 U.S. 188 (1977)). Applying the *Parratt* principle, *Newsome* construed *Albright* as rejecting a constitutional claim of malicious prosecution where state law provides a meaningful remedy for that tort. *Id.*

But *Albright* must be understood in the context of its facts. As we explained at length in *Armstrong*, *Albright* has nothing at all to say about a deprivation of the due-process right to a fair trial. 786 F.3d at 539–41. That is, *Albright* did not involve a plaintiff who claimed he was wrongfully *convicted* of a crime in a trial tainted by falsified evidence, known perjury, or the deliberate destruction of exculpatory evidence. *Id.* at 540. That kind of claim is "grounded in the due process guarantee of fundamental fairness in criminal prosecutions" and has long been recognized. *Id.* The *Parratt* doctrine, we explained in *Armstrong*, doesn't apply in this context. *Id.* at 539–41. The availability of a state-law remedy for malicious prosecution doesn't defeat a federal due-process claim against an officer who fabricates evidence that is later used to obtain a wrongful conviction.[4] *Id.*

───────────────

[4] It bears noting that the claim in *Newsome* was materially different from the claim in *Albright*. As we've explained, the plaintiff in *Albright* was never convicted; the charges against him were dropped, so his claim rested on an assertion that he was prosecuted without probable cause. *Albright*, 510 U.S. at 271. In contrast Newsome was convicted, imprisoned for many years, exonerated and released, and later pardoned. *Newsome v. McCabe*, 256 F.3d 747, 748–49 (7th Cir. 2001). He sued five officers under § 1983 alleging *Brady* violations and claims for "malicious prosecution." *Id.* at 749. Applying Justice Kennedy's *Albright* concurrence, the panel rejected the malicious-prosecution theory but let the

So it was a mistake for the judge to set aside the verdict on this ground. That Wisconsin provides a remedy for malicious prosecution is irrelevant to the viability of Avery's § 1983 claims for deprivation of his right to a fair trial. The jury found that Detectives Phillips and Hernandez manufactured the confession that featured prominently in his trial and contributed to his wrongful conviction for Griffin's murder.

The judge's second reason for setting aside the verdict rested on the immunity rule that witnesses at a criminal trial cannot be sued for damages flowing from their testimony. *See generally Briscoe v. LaHue*, 460 U.S. 325 (1983). The judge thought the detectives' perjured testimony—and not their falsification of the confession—actually caused Avery's injury. So he concluded that the due-process claims were blocked by absolute immunity.

This rationale is flawed for two reasons. First, virtually any item of evidence introduced at trial must be authenticated by oral testimony. *See* FED. R. EVID. 901. Here, the detectives testified about Avery's "confession" and authenticated their false reports memorializing it; the reports were then

---

*Brady* claims stand, affirming the denial of qualified immunity. *Id*. at 751–52. The panel explained that although Newsome didn't have a cognizable malicious-prosecution claim grounded in due process or the Fourth Amendment, he *did* "have a due process claim in the original sense of that phrase—he did not receive a fair trial if the prosecutors withheld material exculpatory details." *Id*. at 752. Because *Newsome* involved a wrongful *conviction*, not merely a wrongful *prosecution*, its invocation of *Albright* was arguably misplaced, or at least not strictly necessary to the outcome; the due-process claims were allowed to move forward under the rubric of *Brady*.

introduced into the trial record. If an officer who fabricates evidence can immunize himself from liability by authenticating falsified documentary or physical evidence and then repeating the false "facts" in his trial testimony, wrongful-conviction claims premised on evidence fabrication would be a dead letter. That would squarely conflict with our caselaw—most notably *Whitlock*—and would put us at odds with every other circuit to consider the viability of due-process claims premised on fabricated evidence.[5]

---

[5] *See, e.g., Cole v. Carson*, 802 F.3d 752, 773 (5th Cir. 2015), *cert. granted, vacated and remanded*, No. 16-351, 2016 WL 4991790 (Nov. 28, 2016) (for further consideration in light of *Mullenix v. Luna*, 136 S. Ct. 305 (2015)); *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1328 (11th Cir. 2015) (holding that an allegation that police officers fabricated evidence and lied in their police reports, and that these fabrications caused the plaintiff's incarceration, is sufficient to state a § 1983 claim); *Coggins v. Buonora*, 776 F.3d 108 (2d Cir.), *cert. denied*, 135 S. Ct. 2335 (2015) (holding that a police officer who falsified police reports, made false statements to a district attorney, and otherwise fabricated evidence is liable to a § 1983 suit); *Halsey v. Pfeiffer*, 750 F.3d 273, 294 (3d Cir. 2014) ("[I]f a defendant has been convicted at a trial at which the prosecution has used fabricated evidence, the defendant has a stand-alone claim under section 1983 based on the Fourteenth Amendment if there is a reasonable likelihood that, without the use of that evidence, the defendant would not have been convicted."); *Livers v. Schenck*, 700 F.3d 340, 354 (8th Cir. 2012) ("[T]he Fourteenth Amendment's guarantee of due process is violated by the manufacture of … false evidence in order to falsely formulate a pretense of probable cause.") (internal quotation marks omitted); *Wilkins v. DeReyes*, 528 F.3d 790, 805 (10th Cir. 2008) (holding that the plaintiff's assertion that officers intentionally coerced false statements supported a § 1983 claim); *Washington v. Wilmore*, 407 F.3d 274, 282 (4th Cir. 2005) (holding that "proof that [the officer] fabricated evidence and that the fabrication resulted in a deprivation of … liberty" is sufficient to state a § 1983 claim); *Limone v. Condon*, 372 F.3d 39, 49 (1st Cir. 2004) (holding

Second, and more fundamentally, the judge's reasoning is utterly at odds with the Supreme Court's decision in *Buckley v. Fitzsimmons*, 509 U.S. 259 (1993). There the Court held that although a prosecutor is absolutely immune from liability for the actions he takes during the course of a prosecution, he remains subject to liability for misconduct committed in an investigative capacity "before he has probable cause to have anyone arrested." *Id.* at 274. We've read the *Buckley* exception to mean that a "prosecutor cannot retroactively immunize himself from conduct by perfecting his wrong-doing through introducing the fabricated evidence at trial and arguing that the tort was not completed until a time at which he had acquired absolute immunity." *Fields II*, 740 F.3d at 1114. Although this case involves evidence fabrication by detectives, not a prosecutor, the judge's ruling gives the detectives' testimony precisely that impermissible effect.

It's true that the detectives' testimony was a factual predicate for Avery's claim: A § 1983 claim requires a constitutional violation, and the due-process violation wasn't complete until the false confession was introduced at Avery's trial, resulting in his conviction and imprisonment for a

---

that an officer who coaches a witness whom he knows will commit perjury is liable to a § 1983 suit); *Devereaux v. Abbey*, 263 F.3d 1070, 1074–75 (9th Cir. 2001) (en banc) ("[T]here is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government."); *Stemler v. Florence*, 126 F.3d 856, 872 (6th Cir. 1997) (holding that a police officer "violate[s] … due process if he knowingly fabricated evidence against [a criminal defendant] and if there is a reasonable likelihood that the false evidence could have affected the judgment of the jury").

murder he did not commit. *See Cairel v. Alderden*, 821 F.3d 823, 831 (7th Cir. 2016) (explaining that the plaintiff's acquittal foreclosed his due-process evidence-fabrication claim); *see also Whitlock*, 682 F.3d at 582. After all, it was the admission of the false confession that made Avery's trial unfair. As we explained in *Fields II*, however, under common-law causation principles, "[h]e who creates the defect is responsible for the injury that the defect foreseeably causes later." 740 F.3d at 1111–12.

When the detectives falsified their reports of a nonexistent confession, it was entirely foreseeable that this fabricated "evidence" would be used to convict Avery at trial for Griffin's murder. That was, of course, the whole point of concocting the confession. An unbroken causal chain connects the acts of evidence fabrication to Avery's wrongful conviction and imprisonment. The detectives are liable under § 1983 for this due-process violation even though their trial testimony, standing alone, would not subject them to damages liability.

So the judge was wrong to set aside the verdict on this ground. The jury's verdict—including the City's liability on the *Monell* claim, which is not independently challenged—must be reinstated.

### B. Summary Judgment on the *Brady* Claims

For present purposes, the defendants do not dispute the facts underlying Avery's *Brady* claims: The detectives (the larger group) failed to disclose material impeachment evidence regarding their interrogations of the three jailhouse informants, and their suppression of this evidence preju-

diced Avery's defense. *See Kyles v. Whitley*, 514 U.S. 419, 437–38 (1995).

We've held, however, that evidence cannot be said to have been suppressed in violation of *Brady* if it was already known to the defendant. *See Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir. 2003). Other circuits agree. *See, e.g.*, *Fullwood v. Lee*, 290 F.3d 663, 686 (4th Cir. 2002); *West v. Johnson*, 92 F.3d 1385, 1399 (5th Cir. 1996); *Felker v. Thomas*, 52 F.3d 907, 910 (11th Cir.), *opinion supplemented on denial of reh'g*, 62 F.3d 342 (11th Cir. 1995); *United States v. Diaz*, 922 F.2d 998, 1007 (2d Cir. 1990); *Atkins v. County of Riverside*, 151 F. App'x 501, 505 n.4 (9th Cir. 2005) (citing *Gauger*, 349 F.3d 354); *see also United States v. Agurs*, 427 U.S. 97, 103 (1976) (stating that *Brady* applies to "information which had been known to the prosecution but unknown to the defense").

We've applied the *Gauger* rule to preclude *Brady* claims against officers who failed to disclose the coercive circumstances surrounding the statements of prosecution witnesses when the criminal defendant already knew of those circumstances. *Petty*, 754 F.3d at 423–24; *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1029 (7th Cir. 2006). We've also applied it in a case involving officers who falsely reported a relationship between the criminal defendant and a third party. *Harris v. Kuba*, 486 F.3d 1010, 1016–17 (7th Cir. 2007).

Here, the judge correctly stated the *Gauger* rule but misapplied it to this case. Recall that Avery's *Brady* claims are premised on the detectives' failure to disclose the details of the pressure and inducements they brought to bear to extract false statements from Randolph, Kent, and Kimbrough. The judge thought the *Brady* obligation "dropped out" because Avery already "knew what he said (or didn't say) to the

jailhouse informants." But that's beside the point; the material question is whether Avery was aware of *the impeachment evidence*.

In *Gauger*, *Petty*, and *Sornberger*, the criminal defendants were already aware of the impeaching facts—namely, that the testimony in question was coerced. In *Harris* the criminal defendant was just complaining that the officer didn't admit to falsifying his report. Here, in contrast, Avery knew that the informants' statements were false, but he did *not* know about the pressure tactics and inducements the detectives used to obtain them. And he did not know that Kimbrough had in fact recanted his statement just before trial but was told that he "had to" testify. In other words, he did not have the evidence that could help him *prove* that the informants' statements were false. The *Gauger* rule does not apply. Summary judgment on the *Brady* claims was improper.

### III. Conclusion

Because the judge's summary-judgment and Rule 59(e) rulings rested on legal errors, the jury's verdict must be reinstated in its entirety and the *Brady* claims must be revived and allowed to move forward. We REVERSE and REMAND for further proceedings consistent with this opinion.